IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

GEORGIA-PACIFIC CONSUMER
PRODUCT LP

                                                    PLAINTIFF

        v.                   Case No: 6:08-cv-6086

MYERS SUPPLY, INC.

                                                    DEFENDANT

<u>**MEMORANDUM OPINION**</u>

    This matter is before the Court following a two-day bench trial on July 6-7, 2009 in Hot Springs, Arkansas. Shortly after the commencement of the litigation, the Plaintiff Georgia-Pacific moved for preliminary injunction (Doc. 3) and Defendant Myers Supply moved to dismiss or stay (Doc. 18). Following a hearing on November 17, 2008, Magistrate Judge Barry Bryant issued Report and Recommendations for Denial of both Motions (Doc. 34,35) which the Court adopted (Doc. 40,42). On June 26, 2009, the Court Denied Georgia-Pacific's Motion for Summary Judgment and Granted in Part and Denied in Part Myers' Motion for Summary Judgment (Doc. 76). At the time of the trial, contributory trademark infringement was the sole remaining issue.

**A. Findings of Fact**

1.  Georgia-Pacific is a large supplier of commercial paper products and commercial paper product dispensers.

2.   Myers Supply is a janitorial and sanitary supply distributor located in Hot Springs, Arkansas. Myers is an authorized distributor of Von Drehle Corporation products, but not of Georgia-Pacific products.

3.   Brown Janitorial Supply is an authorized Georgia-Pacific distributor located in Little Rock, Arkansas.  Brown competes with Myers Supply, and Brown and Myers solicit some of the same customers.

4.   Georgia-Pacific began work on developing a hands-free paper towel dispensing system sometime before 2000.

5.   Georgia-Pacific's research and development efforts resulted in the enMotion paper towel dispenser, which dispenses a pre-measured amount of paper towel upon activation of a motion sensor. The sensor is designed to respond to a hand waving in front of the dispenser

6.   Georgia-Pacific launched the enMotion paper towel dispenser in the fourth quarter of 2002. At that time, it was not the only electronic handsfree paper towel dispenser on the market.

7.   Georgia-Pacific contends it spent approximately seventy million dollars developing the enMotion dispenser, and still more on the enMotion paper. The enMotion paper uses a through-air-drying system which is different from the more conventional "baking" technique.

8.  Georgia-Pacific distributes enMotion dispensers by leasing the dispensers to distributors, including Brown Janitorial Supply. These leases allow Georgia-Pacific to retain ownership of the dispenser. The leasee is then contractually obligated to fill the dispenser with enMotion paper.

9.  Leasees of the enMotion dispensers are free to sublease the dispensers at prices of their choosing, but the leases obligate the leasees to obligate the subleasee to only use enMotion paper in enMotion dispensers. Georgia-Pacific uses a standard form for recording the subleases.

10. Georgia-Pacific considers its enMotion dispensers and enMotion paper to be one system and uses its dispenser leases as a loss leader for sales of its enMotion paper towels, which are some of the most expensive paper towels on the market.

11. Georgia-Pacific considers the entities that own or sublease paper towel dispensers to be the end users.

12. Georgia-Pacific reproduces the contractual paper towel restrictions on a sticker on the inside of the enMotion dispenser and also on the warranty cards found inside new dispensers.

13. In addition to the leases, Georgia-Pacific protects its sales of enMotion towels to enMotion dispenser subleasees

AO72A
(Rev. 8/82)

using the physical dimensions of the towel roll. The most common industry paper towel width is eight inches. Georgia-Pacific's enMotion towels are ten inches wide. This size difference makes it more difficult to place non-enMotion towels in enMotion dispensers.

14. Georgia-Pacific's registered trademarks are found on the enMotion dispensers and on the containers for the enMotion towels. Except for its "enMotion with Lotion" towels, no paper towels relevant to this case had any source-identifying marks printed on them.

15. The primary motivation for displaying enMotion with Lotion on the towels is to warn the user of the presence of the lotion so the towel would not come into contact with food.

16. Georgia-Pacific has valid, protectable trademarks. No. 2,834,670 is for ENMOTION in connection with paper towels; no. 998,444 is for the GP triangle for paper towels and dispensers, and no. 994,319 is for "Georgia-Pacific" for paper towels and toilet tissue and paper towel and toilet tissue dispensers.

17. The Von Drehle 810-B paper towel is a ten-inch towel that fits enMotion dispensers with no apparent difficulty.

18. Both Von Drehle 810-B and enMotion paper towels are sold in containers bearing the appropriate trademarks. No attempt was made to pass-off Von Drehle towels as enMotion towels

AO72A
(Rev. 8/82)

in connection with a sale from a distributor to an end-user.

19.  The Von Drehle 810-B costs less than enMotion towels. EnMotion towels have a more cloth-like feel while Von Drehle towels are more crinkly and paper-like.

20.  Myers began selling Von Drehle 810-B paper towels in September 2007. At that time, the enMotion was the only ten inch dispenser widely available.

21.  Myers knew with ninety-nine percent certainty that the Von Drehle 810-B towels that it sold would be placed in an enMotion dispenser.

22.  Georgia-Pacific sent cease-and-desist letters to Myers Supply on July 1, 2008 and again on August 13, 2008.

23.  In the July 1, 2008 cease-and-desist letter, Georgia-Pacific informed Myers of Georgia-Pacific's awareness that Myers attempted to sell non-enMotion roll towels for use in enMotion dispensers to Gospel Lighthouse Church and Academy. That letter accused Myers of "unauthorized and infringing use of the enMotion trademark" and "tortious interference with our [Georgia-Pacific's] authorized distributors and end users." The letter does not accuse Myers of contributory infringement or state a belief that Gospel Lighthouse was itself infringing Georgia-Pacific's trademarks. The letter instead accuses Myers of direct

AO72A
(Rev. 8/82)

infringement.

24. Myers continued selling 810-B towels after receiving the cease-and-desist letter

25. The practice of refilling a paper towel dispenser bearing a company's trademarks with paper towels from another company is known as "stuffing."

26. Gospel Lighthouse was the only end-user for whom Georgia-Pacific demonstrated Myers' knowledge of a specific end-users' stuffing activities.

27. As there was no indication that Myers received the second cease-and-desist letter, no one at Myers was aware of its contents, and the letter's contents are not relevant to this case.

28. Myers also had general knowledge that 810-B towels were very likely to be used for stuffing.

29. The end users make the decision about what kind of paper they place in the dispenser and the end user actually loads the paper into the dispensers.

30. Georgia-Pacific has a cross-reference guide that references Georgia-Pacific paper towels comparable to its competitors' paper towels.

31. It is a generally accepted practice in the paper towel business to put one brand of paper towels in a dispenser carrying another brands' trademarks if the dispenser is not

AO72A
(Rev. 8/82)

leased.

32. Dr. Eli Seggev performed a survey (hereinafter the "Seggev Survey") that attempted to gauge consumer expectations and likelihood of confusion. Participants in the Seggev Survey were paid to use a simulated washroom and answer questions about their experience. Because of the design of the study, it is of minimal probative value due to the manner and nature of the questions and the lack of any control.

33. The survey taken by Kenneth Hollander (hereinafter the "Hollander Survey") asked a series of questions over the internet. The Hollander Survey provides evidence that a small number of consumers believe trademarks on a dispenser identify the source of the paper towels.

34. Georgia-Pacific offers "universal" towel dispensers that bear Georgia-Pacific trademarks. Steven Seamon's testimony reflected the generally held belief that there is no impropriety in placing non-Georgia-Pacific paper towels in one of these universal dispensers.

35. No evidence was presented that explained how Georgia-Pacific trademarks could be source-identifying on enMotion dispensers, but not source-identifying on universal dispensers.

36. Andy Anderson, Chad Tillery, Steven Seamon, and Ryan Myers's testimony reflected the belief among salespeople

and end-users that stuffing is not wrongful unless the dispenser is leased.

37.  The testimony of Andy Anderson, Steve Seamon, Ryan Myers, and Chad Tillery are strong and credible evidence that the trademarks on paper towel dispensers do not identify the source of the towels.

## D. Discussion

To show contributory infringement, Georgia-Pacific must show that Myers either (1) intentionally induced a primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied. *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982). As the record is void of evidence of intentional inducement, the Court focuses on the second part of the *Inwood Labs* test. The second part of the test has three elements; actual infringement, knowledge of the infringement, and continued supply of the product after acquiring knowledge of the infringement.

### 1. Myers Supply's Knowledge

First, the Court looks at Myers' general knowledge of the market and knowledge it had of particular customers' usage of 810-B towels. Ryan Myers, who oversees most of the day-to-day operations at Myers Supply, admitted with ninety-nine percent certainty that the 810-B towels would be placed in a Georgia-

Pacific dispenser. This certainty was at least partially the result of the lack of other dispensers on the market that utilized a ten inch towel. This testimony reflects Myers general awareness that the 810-B towels it sold were going to be placed in enMotion dispensers.

In addition, the evidence presented at trial reflected Myers' knowledge that at least one specific customer was stuffing enMotion machines with 810-B towels. Georgia-Pacific sent, and Myers received, a cease-and-desist letter naming Gospel Lighthouse as a subleasee of an enMotion machine and indirectly indicating that stuffing was taking place. Myers continued to sell to Georgia-Pacific subleasees, including Gospel Lighthouse, after receiving the cease-and-desist letter. However, no evidence was presented that Myers knew that a particular customer would place the 810-B towels in a Georgia-Pacific dispenser before receiving the letter. After receiving the letter, Myers began asking its customers if they were subleasees of Georgia-Pacific dispensers. Based on the testimony, Myers was aware that purchasers of 810-B towels were stuffing enMotion dispensers and continued to sell 810-B towels to customers it believed would use the 810-B to stuff enMotion dispensers.

## 2. Actual Infringement

The second element of contributory infringement is actual

AO72A
(Rev. 8/82)

infringement. To show infringement, a trademark must be used in commerce in connection with goods or services in a way likely to cause confusion as to source or sponsorship of the goods or services. 15 U.S.C. § 1125 (a)(1)(A). A preliminary question of infringement is whether the infringer is using the plaintiff's mark in a source identifying way. *Interactive Prod. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695 (6th Cir. 2003).

The first function of trademarks is to identify one seller's goods and distinguish them from goods sold by others. McCarthy on Trademarks and Unfair Competition § 3:2 (4th ed. 2009). The direct infringement element of this case presents the issue of whether a trademark is used in a source identifying manner, which is not a commonly raised question. Here, Georgia-Pacific owns the rights to use "enMotion," the GP triangle, and "Georgia-Pacific" as trademarks in connection with paper towels, and the evidence before the Court indicates that all paper towel sales were made using the correct trademarks. There is no evidence that Myers or Von Drehle ever attempted to pass-off Von Drehle paper towels as enMotion towels during a sale or to deceive a purchaser. Rather, the issue is whether the trademarks on a paper towel dispenser serve to identify the paper towels contained therein, such that the practice of stuffing enMotion towel dispensers with Von Drehle paper towels creates a

AO72A
(Rev. 8/82)

likelihood of confusion as to the source of the towels, and thus constitutes infringement.

Georgia-Pacific argues that stuffing is a form of trademark infringement known as "passing-off" and that the stuffer is deceiving the public as to the source of the paper towels. Georgia-Pacific's theory analogizes stuffing to dispensing knock-off syrup in a Coca-Cola dispenser or selling knock-off gasoline from a Mobil pump. If the marks on the dispenser are source-identifying, as they are on a Coca-Cola dispenser or a gas pump, then consumers are likely to be confused. If the mark is not source identifying, then consumers are not likely to be confused. If the mark is source-identifying, then there is a likelihood of confusion and stuffing is trademark infringement.

The Eighth Circuit uses a six factor test to evaluate the likelihood of confusion. *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005). Those factors are 1) the strength of the plaintiff's mark; 2) the similarity between the plaintiff's and defendant's marks; 3) the degree to which the allegedly infringing product competes with the plaintiff's goods; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers, and 6) evidence of actual confusion. *Id.* Likelihood of confusion is a fact-intensive inquiry. *Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc.*, 466 F.3d 630, 634 (8th Cir. 2006).

**AO72A**
**(Rev. 8/82)**

The Court first evaluates the strength of Georgia-Pacific's marks. "Arbitrary marks comprise those words, symbols, pictures, etc., that are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services." 2 McCarthy on Trademarks and Unfair Competition § 11:11 (4th ed. 2009). Arbitrary marks are generally considered strong marks, unless the word is commonly used as a mark. *Id.* at § 11:14. Suggestive marks, which are also strong marks, "shed some light upon the characteristics of the goods, but so applied they involve an element of incongruity, and in order to be understood as descriptive, they must be taken in a suggestive or figurative sense through an effort of the imagination on the part of the observer." *Id.* at 11:64 (citing *Gen. Shoe Corp. v. Rosen*, 11 F.2d 95 (4th Cir. 1940)). "Georgia-Pacific" is not commonly used as a mark and neither suggests nor describes any ingredient, quality or characteristic of paper towels or paper towel dispensers and is therefore arbitrary. "enMotion" as applied to the dispensers is suggestive because of the motion activated nature of the dispensers and arbitrary when applied to the paper towels. Georgia-Pacific's arbitrary and suggestive marks are both considered strong, and this factor weighs in favor of Georgia-Pacific.

The second factor is the similarity between the Plaintiff's

and Defendant's marks. Myers sold Von Drehle paper towels with Von Drehle trademarks that are dissimilar. However, after the end-user places the towels in the dispenser, no Von Drehle marks remain visible. This factor does not weigh towards either party.

The third factor is the degree to which the allegedly infringing product competes with the plaintiff's goods. As the ten inch Von Drehle towel competes directly with the ten inch enMotion towel, this factor weighs in favor of Georgia-Pacific.

The fourth factor is the alleged infringer's intent to confuse the public. The testimony in this case is consistent with a belief that stuffing is not likely to confuse the public. Therefore there is no intent to confuse the public on the part of Myers or any end-user, so this factor weighs in favor of Myers.

The fifth factor is the degree of care expected of customers. The evidence presented by both experts indicates a low degree of care on the part of the consumer. The Seggev survey created an artificial bathroom environment where the users had a heightened awareness of the paper towels. This heightened awareness began with the preliminary questions, which indicated that the survey would be about paper towels. Next the survey-takers were placed in an environment where the only visible brand was on the enMotion dispenser, which heightened their awareness even more. Despite the environment and the

Page 13 of 20

preliminary questions, only twenty-four percent of the survey-takers could recall the dispenser brand as Georgia-Pacific, or enMotion. Nine percent named the wrong brand. In the Hollander survey, when shown an enMotion dispenser only one half of one percent of the survey-takers correctly identified it as Georgia-Pacific or enMotion. Based on these findings, the degree of care on the part of the consumers is very low. In a normal likelihood of confusion analysis, a low degree of care by consumers would favor the plaintiff, but in this case, the lack of care is evidence that marks on a dispenser do not perform a meaningful source identifying role as to the brand of the paper towel.

The testimony in this case reflected that Georgia-Pacific considered the purchasers of the paper towels, and not the bathroom using consumers, to be the end-users, so the Court considers that group to be the more important group for purposes of this factor. The testimony of Steve Seamon and Andy Andersen was that the relevant paper towel sales occur between professional sales people selling towels and businesses and non-profits who buy the towels. The towels are purchased in high volumes. Therefore, purchasers exercise a high degree of care. This factor therefore weighs in favor of Myers both in regards to the consumers and the end users.

The sixth factor is actual confusion. "Confusion is relevant when it exists in the minds of persons in a position to

AO72A
(Rev. 8/82)

influence the purchasing decision or persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner." *Mid-State Aftermarket Body Parts*, 466 F.3d at 634 (citing *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 10 (1st Cir. 2004)).

Georgia-Pacific has produced no evidence that an actual consumer or purchaser of paper towels has ever been confused by the presence of Von Drehle paper in an enMotion dispenser. The testimony of Steve Seamon reflected the belief in the industry that the presence of a company's marks on a paper towel dispenser was not an indicator of the origin of the paper towels since he thought it was an acceptable practice to place paper towels of one brand in an unleased dispenser bearing a different brand.

Georgia-Pacific's catalogue is further evidence of the widespread belief that the brand on the dispenser is not indicative of the origin of the paper. The catalogue contains Georgia-Pacific's suggested replacement towels for other manufacturers' towel rolls, including other manufacturers' controlled brands. Seamon's testimony reflected that dispenser leases only, and not trademarks, were the means by which paper towel dispenser owners control the contents of the dispensers bearing their names.

Georgia-Pacific sought to establish likelihood of confusion

AO72A
(Rev. 8/82)

through the testimony and survey of Dr. Eli Seggev and contends that the testimony of Kenneth Hollander and the Hollander Survey supports their position. The Seggev survey was a modified likelihood of confusion survey based on *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980). One problem with Dr. Seggev's method is that the factual issue in *Squirtco* is distinct from the factual issue in this case. In *Squirtco*, as in many trademark cases, the issue was whether there was a likelihood of confusion between two similar trademarks. In this case, the question of consumer confusion concerns whether a trademark on one product, the towel dispenser, identifies the source of an unmarked complementary product, the paper towels inside the dispenser. The Seggev survey placed two complementary goods together, one carrying trademarks, and one without trademarks. Seggev then asked the survey-taker if they thought the only trademark they were shown identified the complementary product that was without visible trademarks.

Two question were central to the Seggev survey. Question 7 asked "Do you think the brand of the towel that came from the dispenser that you just used is the same as the dispenser brand or different from the dispenser brand?" Question 8 asked "Did you expect the towel dispensed from that dispenser to be affiliated, connected, or associated with the company that made the dispenser?" These questions are based on questions that

Page 16 of  20

would be asked during a "likelihood of confusion survey," which is a term of art. A likelihood of confusion survey helps determine the likelihood of confusion between two marks, and not to determine if a certain mark is source identifying. Likelihood of confusion surveys therefore presuppose that the marks in question are source identifying. This severely limits the probative value of the Seggev survey.

The next problem with the Seggev survey would be the questions posed. The first question asked whether the survey takers thought the brand of towel was "the same as the dispenser brand or different than the dispenser brand." If the dispenser brand is not source identifying, then the survey-taker would have no opinion as to the brand of towel based on merely seeing the brand of the dispenser. The question posed suggests the answers same or different, which pushes survey-takers to form an opinion, which is an outcome favorable to Georgia-Pacific. Seggev's Survey asked the second question only to those who answered "different" or "don't know," and it suffered from the same problems as the first question. The effect was that when the answer to the first question was not favorable to Georgia-Pacific, the survey rephrased the first question and asked it again. This further clouds the results.

The third problem with Seggev's survey is lack of a control. When shown a branded product and an unbranded

complementary product, a certain number of consumers will associate the unbranded product with the branded product, regardless of the source identifying nature of the brand. The Seggev survey had no control which would help quantify and compensate for this problem.

For the reasons in the preceding paragraphs, the Court gives no credence to Seggev's finding that "a majority of respondents in this market expect that the towels dispensed from the Georgia Pacific enMotion dispenser are of the same provenance as the dispenser itself."

The Hollander Survey, though not prepared for this litigation or specific to the relevant markets, is more probative of the question of whether the dispenser trademarks serve to identify the source of the paper. Hollander specifically informed the survey-takers that they could have no opinion and his survey used soap and soap dispensers as an internal control. His survey found that 11.4% believed that the paper towel dispenser and paper towel were almost always the same brand, which is slightly less than those who believed that soap and soap dispensers were almost always the same brand. 11.4% is itself a small number and the true number is probably even lower based on the results of the internal control. The similarity to the numbers produced by the control question suggests that the true number of consumers who believe

trademarks on paper towel dispensers identify the source of the paper towels is very low.

In weighing the evidence of likelihood of confusion, the Court considers the testimony of Andy Anderson, Steven Seamon, Chad Tillery, and Ryan Myers to be more probative of the likelihood of confusion than the expert testimony. The non-expert testimony consistently reflected the belief that stuffing a non-leased dispenser was not considered to be objectionable among people who regularly dealt with paper towels and paper towel dispensers. If the marks on a paper towel dispenser served to identify the source of the paper towels, then at least one witness would have found the practice objectionable. The Court considers their testimony to be credible and to be strong evidence that the trademarks on a paper towel dispenser are not indicative of the origin of the paper towels contained therein. Therefore the preponderance of the evidence shows no likelihood of confusion, no direct trademark infringement, and no contributory infringement.

**D. Conclusions of Law**

1.   Myers was aware that its customers were stuffing Georgia-Pacific paper towel dispensers.

2.   Myers continued to supply paper towels to customers it knew would be used to stuff Georgia-Pacific dispensers.

3.   The stuffing activities described at trial did not create

a likelihood of confusion as to the origin of the paper
towels and thus the preponderance of the evidence does not
demonstrate actual trademark infringement.

4.   Myers has no liability for contributory trademark
infringement.

**E.   Conclusion**

Georgia-Pacific has failed to prove contributory trademark
infringement by a preponderance of the evidence. Since all other
claims have been dismissed, Georgia-Pacific's Complaint is
**DISMISSED WITH PREJUDICE.** Costs will be awarded to Myers as the
prevailing party. The parties have thirty days to appeal.

The Court previously indicated that because of the lateness
of the decision to waive a jury, the jury costs would be
assessed. The parties then agreed that the losing party would
bear the costs. However, the trial could not have been completed
within the two days available to the Court to try the case if
the parties had not agreed to waive the jury. Therefore, the
Court will not assess jury costs. The Court will assess only
statutory costs against Georgia-Pacific.

IT IS SO ORDERED this 23rd day of July, 2009.


                              /s/ Robert T. Dawson
                              Robert T. Dawson
                              United States District Judge


                         Page 20 of 20

AO72A
(Rev. 8/82)